UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ONYINYE JIDEANI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 24-cv-01771 (TSC) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION**

Plaintiff Onyinye Jideani, proceeding *pro se* and *in forma pauperis*, sues the District of Columbia[1] for damages and injunctive relief. *See generally* Complaint ("Compl."), ECF No. 1; Compl. Supp. Pending before the court is the District's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("MTD"),[2] ECF No. 10, opposed by Jideani, *see* Opposition ("Opp'n"), ECF No. 13. For the reasons discussed below, the District's Motion to Dismiss will be granted and this case dismissed without prejudice.

I.     **BACKGROUND**

Jideani is a first-generation American citizen whose parents immigrated to the United States from Nigeria. *See* Compl. at 5–7. Jideani identifies as Nigerian-American. *See id*. She is

---

[1]     On October 16, 2024, at Jideani's request, *see* Mot. for Order to Supplement, ECF No. 14, and with the District taking no position, *see* Response, ECF No. 16, the court substituted the District of Columbia as Defendant for the named agencies, all of which are *non sui juris*, *see* Order, ECF No. 18.

[2]     The District also moved, pursuant to Federal Rule 12(b)(1), to dismiss the Defendant agencies as *non sui juris*, *see* MTD at 6–8, but as noted, *see* n.1 *supra*, the court has since dismissed the named agencies and substituted the District, now the only remaining defendant. Consequently, the District's 12(b)(1) motion is moot.

a resident of the District of Columbia and has been a recipient of public assistance benefits, including Social Security Disability Insurance ("SSDI"), Supplemental Nutrition Assistance Program ("SNAP") benefits, and hospital and medical insurance coverage under Medicare and Medicaid. *See id*. at 5–8. On September 18, 2023, the Social Security Administration ("SSA") terminated Jideani's SSDI and Medicare coverage, retroactive to January 2019. *See* Compl. at 7; *see also* Compl. Exhibits ("Compl. Exs."), ECF No. 1-1, at 29 (screenshot of Jideani's "My Social Security" account page, listing her "Medicare Enrollment Details") ("MSS Acct."); *id.* at 18–19 (Ltr. from SSA, terminating SSDI, dated Sept. 18, 2023). Until that time, as a Medicare recipient and District resident qualified for Medicaid, Jideani's Medicare costs were covered under the District's Qualified Medicare Beneficiary ("QMB") Program. *See* Compl. Exs. at 14 (QMB Renewal Notice, dated Aug. 18, 2023) ("8/18/23 QMB Not.").

Around that same time, Jideani began receiving notices from the District regarding the status of her local benefits. *See* Compl. at 7–8. On August 28, 2023, the D.C. Department of Health Care Finance ("DHCF") sent her a notice advising that it required "additional information to determine if [she was] still eligible for Medicaid coverage under current eligibility rules," and requiring that she complete and return a "QMB Only Application" by November 30, 2023. *See id*. at 7; 8/18/23 QMB Not. Jideani was warned that failure to timely submit that application would result in termination of her Medicaid coverage, and that she would receive separate notice of termination in the mail. *See* 8/18/23 QMB Not.

On September 18, 2023, Jideani received a notice from the D.C. Department of Human Services ("DHS") indicating that it had "received information for an outside data source that may impact [her] eligibility for [SNAP] benefits," and requesting, by September 28, 2023, proof of her medical disability. *See* Compl. at 7; Compl. Exs. at 16 (Ltr. from DHS, dated Sept. 18, 2023)

2

("9/18/23 DHS Ltr.").  Although it appears that Jideani continued to receive SNAP benefits without interruption, there was ongoing confusion regarding her current address of record and other personal data, which interfered with the amount and consistency of her SNAP benefits. *See* Opp'n at 15–16; Opp'n Exhibits ("Opp'n Exs."), ECF No. 13-1, at 4–10 (Decision Ltr. from DHS, dated Jan. 9, 2024) ("1/9/24 DHS Dec. Ltr."); *id.* at 14–16 (OAH Order, dated Apr. 12, 2023).  Ultimately, after clarifying Jideani's address and other personal information, and after Jideani filed an internal grievance, DHS determined that her SNAP benefits were underpaid by $175 per month from March 2023 through July 2023, and she was reimbursed retroactively.  *See* Opp'n at 15–16; 1/9/24 DHS Dec. Ltr.; Compl. Exs. at 11–13 (Jideani's OAH Grievance against DHS, dated Apr. 17, 2023).

Meanwhile, on November 1, 2023, DHCF sent Jideani another notice warning that her medical assistance coverage would terminate on November 30, 2023, because it had not received a completed "renewal packet."  *See* Compl. Exs. at 35–36 (Ltr. from DHCF, dated Nov. 1, 2023) ("11/1/23 DHCF Ltr.").  The notice also included instructions for filing an appeal of a termination of her coverage. *See id*.

Around November 6, 2023, Jideani uploaded through the portal a copy of SSA's September 18th notice terminating her SSDI and Medicare coverage.  *See* Compl. at 7; MSS Acct.  A few days later, on November 9, 2023, Jideani spoke by phone with a DHS representative, who confirmed that it received her uploaded SSA notice, and that it would take about ten days to process.  *See* Compl. at 7; Compl. Exs. at 30–34 (Transcript of Phone Conversation between Jideani and DHS, dated Nov. 9. 2023) ("11/9/23 Tr."); Opp'n at 13–14. The DHS representative also explained that Jideani still had active medical coverage as of that date, but that her benefits would terminate on November 30, 2023, unless she submitted the

3

specific required "paperwork," i.e., the renewal packet and QMB Only Application, as previously requested. *See* 11/9/23 Tr. at 31.

Jideani states that, shortly thereafter, and despite her belief that she had already resolved any outstanding enrollment issues by submitting the September 18th SSA notice, DHS nonetheless "illegally terminated" her Medicaid benefits, forcing her to "pay out of pocket" for prescriptions and medical care and to cancel other medical visits. *See* Compl. at 7–8; Opp'n at 13–16. "Therefore, on November 14, 2023, [she] "resubmitted/reapplied for D.C. Medicaid[.]" Compl. at 8.

About three and a half months later, on March 5, 2024 and March 6, 2024, Jideani received three notices from the District regarding her coverage. The first notice, dated March 5, 2024, came from DHS, and explained that it had received Jideani's application dated November 14, 2023, but it still required verification of her self-employment income to determine her ongoing eligibility for Medicaid. *See id*; *see also* Compl. Exs. at 38 (Ltr. from DHS, dated Mar. 5, 2024). The second notice, also dated March 5, 2024, came from DHCF, and stated that Jideani's retroactive Medicaid coverage was denied for the months of May, June, and July 2023, because she was "not a U.S. citizen or did not have an eligible immigration status during the Retroactive Period." *See* Compl. at 7; Compl. Exs. at 37 (Ltr. from DHCF, dated Mar. 5, 2024) ("3/5/24 DHCF Ltr."); *see also* Opp'n at 2–5. The third notice, also from DHCF, dated March 6, 2024, notified Jideani that she qualified for Medicaid coverage effective March 1, 2024, and that she could begin receiving covered services immediately using her existing Medicaid ID number. *See* Compl. Exs. at 39–40 (Ltr. from DHCF, dated Mar. 6, 2024). That notice, however, did not contain Jideani's health insurance "enrollment packet," containing information regarding available managed care plans, which she states she did not receive until April 10, 2024. *See*

4

Compl. at 8; *see also* Compl. Exs. at 41–43 (D.C. Healthy Families Plan Selection Forms, dated Apr, 10, 2024); *id*. at 50–76 (Emails between Jideani and Ombudsman, dated March/April 2024) ("Ombudsman Emails"); *id.* at 50–54 (Emails from Ombudsman confirming mailing of the enrollment packet to Jideani's updated address of record, dated Apr. 9, 2024).

Shortly after receiving these notices, Jideani began emailing with the Office of the Health Care Ombudsman and Bill of Rights ("Ombudsman") regarding her enrollment in D.C. Medicaid.  *See* Compl. at 8; *see generally* Ombudsman Emails.  Through the course of these emails, answers began to emerge regarding the ongoing confusion and delay.  *See id.*  First, Jideani highlighted the March 5th notice purporting to deny her retroactive Medicaid based upon her citizenship or immigration status.  *See* Ombudsman Emails at 69–70.  She indicated that she has always been a U.S. citizen, and moreover, had never applied for such retroactive coverage. In response, the Ombudsman apologized for the error regarding her citizenship, and then explained that Jideani accidently checked the box for retroactive coverage on her re-enrollment form, though Jideani disagrees with this explanation.  *See id*.; Compl. at 8.  Second, per the Ombudsman, there were problems verifying Jideani's address of record.  *See* Ombudsman Emails at 69–70.  Third, the Ombudsman explained that, due to changes in Jideani's status, and based on current federal contracts, Jideani was required switch to a new managed care plan.  *See id*. at 50–51, 55, 55–64, 68–72; Compl. at 8.  Fourth, Jideani contends that, for the first time, she was informed that her D.C. Medicaid had been her secondary insurance while she received SSDI, when she thought it was her active primary coverage.  *See* Opp'n at 16.

During these discissions, the Ombudsman provided Jideani electronic copies of her Medicaid approval paperwork and ID card and twice arranged for hard copies to be mailed to her address, *see* Ombudsman Emails at 51, 61–63; explained the nature of her coverage and

answered her questions about the process for enrolling in a new managed care plan, *see id*. at 55–61; and investigated her claim that Safeway pharmacy was denying her prescription benefits, though Jideani alleges that this was done, at least in part, without her consent. *See id*. at 55–57, 65–68, 73–75.

Notwithstanding, Jideani's Medicaid coverage was denied by three different providers between May 6, 2024, and June 7, 2024, and other attempts to fill prescriptions were denied by her pharmacy from November 2023 through June 2024. *See* Compl. at 5, 8–11; *see also* Compl. Exs. at 1–13, 44–49 (printouts from medical providers and pharmacies indicating Jideani's medical insurance was inactive). The Ombudsman explained that at some of these denials were caused by the type and quantity of the medication requested, *see* Ombudsman Emails at 68, but Jideani disagrees, *see* Compl. at 8.

By April 10, 2024, Jideani's Medicaid coverage was reactivated, although she was warned, by a letter from DHS dated August 30, 2024, of possible subsequent deactivation if she did not complete an attached medical recertification by September 30, 2024. *See* Opp'n at 17; *see also* Opp'n Exs. at 17–43 (Ltr. from DHS, dated Aug. 30, 2024). Jideani claims that her recertification should not be due until April 2025, and therefore finds DHS's request for recertification to be suspicious. *See* Opp'n at 17.

Jideani also states that, on June 11, 2024, she filed a "Combined Benefit Form" with DHS for an Interim Disability Assistance ("IDA") cash benefit, *see* Opp'n at 18, which provides temporary financial assistance to adults with disabilities while an SSDI application is pending with SSA, *see* D.C. Code § 4–204.07(a). According to Jideani, she did not hear back until July 30, 2024, when DHS informed her, for the first time, that she also needed to submit an SSA form confirming that she reapplied for SSDI benefits. *See* Opp'n at 18. Jideani states that she

submitted the SSA paperwork to DHS on August 2, 2024, and again on September 11, 2024, confirming that that she reapplied for SSDI benefits on December 5, 2023, but that as of September 24, 2024, she had yet to receive any IDA benefit, and her application was still pending beyond the 60-day window for processing.  *See id*.; *see also* Opp'n Exs. at 44 (photograph by Jideani of her dropping off SSA paperwork).

In the interim, on June 16, 2024, Jideani filed this case. She alleges that the aforementioned difficulties in securing her public assistance benefits are part of an eight-year history of "the same deceptive and unlawful practice" by the District.  *See id.* at 5–8; Opp'n at 2–3.  She alleges that District's actions arise out of discriminatory animus based on her Nigerian descent, in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI").  *See* Compl. at 5–7; Opp'n at 3.  She demands an injunction to, *inter alia*, ensure continued use of her Medicaid coverage and to secure her IDA cash benefit, and $188,000 in damages.  *See id*. at 9–10; Opp'n at 20.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal,* 556 U.S. at 678–79, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" and "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss."

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Id.* at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A court must "treat a complaint's factual allegations as true . . . and must grant a plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citations omitted) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). Notwithstanding, a pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In assessing a 12(b)(6) challenge, a court may ordinarily consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint and matters about which the Court may take judicial notice," *Gustave–Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997)), without converting the motion to dismiss into one for summary judgment, *Baker v. Henderson*, 150 F. Supp. 2d 13, 15 (D.D.C. 2001) (citations omitted). This includes documents that are "referred to in the complaint and . . . central to the plaintiff's claim," even if they are produced by defendant in furtherance of a motion to dismiss. *See Solomon v. Office of the Architect of the Capitol*, 539 F. Supp. 2d 347, 349–50 (D.D.C. 2008) (citing *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999)) (internal citations omitted).

Furthermore, "the pleadings of *pro se* parties are to be 'liberally construed' and 'held to less stringent standards than formal pleadings drafted by lawyers[.]'" *Tyson v. Brennan*, 277 F.

8

Supp. 3d 28, 35 (D.D.C. 2017) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per

curiam)), *aff'd*, No. 18-5033, 2018 WL 5927921 (D.C. Cir. Nov. 7, 2018).  Similarly, a *pro se*

litigant's complaint must be evaluated "in light of all filings, including filings responsive to a

motion to dismiss, which here includes [plaintiff's] opposition to the motion to dismiss and

attached exhibits."  *Ho v. Garland*, 106 F.4th 47, 50 (D.C. Cir. 2024) (quotation marks omitted)

(quoting *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015) (per

curiam)).

## III.    DISCUSSION

### i.    <u>Title VI Claim</u>

Title VI provides in relevant part that "[n]o person in the United States shall, on the

ground of race, color, or national origin, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any program or activity receiving Federal financial

assistance." 42 U.S.C. § 2000d.

To state a claim under Title VI, a plaintiff must plausibly allege that (1) she was the

intended beneficiary of, or an applicant for, participation in a federally funded program, and (2)

defendant engaged in discrimination relating thereto.  *See Xingru Lin v. Dist. of Columbia*, No.

16-645, 2019 WL 1597876, at *17–18 (D.D.C. Apr. 15, 2019).  As to the second element,

"[w]hat is necessary, however, for both constitutional and Title VI claims is a showing of

*intentional* discrimination."  *Smith v. Henderson*, 944 F. Supp. 2d 89, 100 (D.D.C. 2013)

(emphasis in original) (citing *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) ("[I]t is similarly

beyond dispute—and no party disagrees—that [Title VI] prohibits only intentional

discrimination" when a plaintiff seeks damages)) (other citation omitted); *Lin v. Dist. of*

*Columbia*, 47 F.4th 828, 847 (D.C. Cir. 2022) (same).  Establishing intentional discrimination "is

notoriously difficult," because "discriminatory intent 'implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'"  *Smith v. Henderson*, 54 F. Supp. 3d 58, 68–69 (D.D.C. 2014) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)), *appeal dismissed*, No. 14–7120, 2015 WL 5237333 (D.C. Cir. Aug. 19, 2015).

Furthermore, individuals cannot be held liable under Title VI.  *See Mwabira-Simera v. Howard University*, 692 F. Supp. 2d 65, 70 (D.D.C. 2010) (citing *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1169–70 (11th Cir. 2003) (other citation omitted)); *Newman v. Howard Univ. School of Law*, No. 23-0436, 2024 WL 4227723, at *9 (D.D.C. Sept, 18, 2024) ("Title VI . . . prohibit[s] discrimination only by programs and activities, not individuals.").  To that same end, there is no liability via *respondeat superior* under Title VI, and a municipality's liability is thus limited to its own misconduct.  *See Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 288 (1998) ("Congress did not intend to allow recovery in damages [under Title IX or Title VI] where liability rests solely on principles of vicarious liability or constructive notice."); *Arthur v. Dist. of Columbia Housing Auth.*, No. 18-cv-2037, 2020 WL 1821111, at *11 (D.D.C. Apr. 11, 2020) (citing *U.S. v. Cty. of Maricopa*, 889 F.3d 648, 652 (9th Cir. 2018) (explaining the Supreme Court has "interpreted Title IX consistently with Title VI" and that, under either statute, there can be no *respondeat superior*), *cert. denied*, 586 U.S. 1247 (2019)).

And alleging a municipality's own misconduct, i.e., its own intentional discrimination, under Title VI, requires what is tantamount to a *Monell* analysis of an Equal Protection claim under 42 U.S.C. § 1983.  *See Maricopa*, 889 F.3d at 652–53 (relying on *Davis ex rel. LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640 (1999) (finding that a municipality may be

liable under Title IX, and therefore, under Title VI, for its own customs or policies, or if an official with power to take corrective action was "deliberately indifferent to known acts" of discrimination) (other citation omitted)); *Gebser*, 524 U.S. at 291 (locating an analog to the Title IX jurisprudence in the municipal liability doctrine); *Doe v. Galster*, 768 F.3d 611, 622 (7th Cir. 2014) (applying the same deliberate indifference analysis to Title VI and Title IX claims as to an equal protection claim); *Gebretsadike v. Dist. of Columbia*, No. 22-cv-1951, 2023 WL 2708822, at *4–5 (D.D.C. Mar. 30, 2023) (holding that disparate impact is not enough to sustain a Title VI claim—the plaintiff must allege that final policymakers enacted a discriminatory policy specifically because of the plaintiffs' protected characteristics); *see also Alexander v. Choate*, 469 U.S. 287, 293 (1985) ("We will not engage in a separate discussion of the Title VI statutory claims, as such an inquiry would duplicate exactly our equal protection analysis. Our equal protection discussion should be understood as disposing of plaintiffs' Title VI claims.") (cleaned up); *Elston v. Talladega Cnty. Bd. of Educ.*, 997 F.2d 1394, 1406 n.11 (11th Cir. 1993) ("Title VI itself provides no more protection than the equal protection clause[.]")

Here, there is no dispute that Jideani was an applicant for and a recipient of D.C. Medicaid and other public assistance benefits, and that the District received federal funds to administer these services. There is, however, a dispute as to whether Jideani has sufficiently alleged that the District itself intentionally discriminated against her. Upon review, the court agrees with the District that Jideani fails to meet this bar.

Jideani repeatedly asserts that the District has engaged in an ongoing "unlawful discriminatory delusive practice" to deny her benefits based on her Nigerian heritage. *See, e.g.*, Compl. at 5–6, 11; Opp'n at 2, 4–5, 19–20. But she provides no facts to support this allegation.

Aside from referencing the fact that she is Nigerian-American, Jideani fails to present actual facts to support a cognizable claim that the District's actions were taken based on her national origin.  A plaintiff cannot "merely invoke" her association with a protected class "in the course of a claim's narrative and automatically be entitled to pursue relief[,]" *Bray v. RHT, Inc.*, 748 F. Supp. 3, 5 (D.D.C. 1990), *aff'd*, 976 F.2d 45 (D.C. Cir. 1992) (per curiam), and "bare assertions" of a "discrimination claim" are "not entitled to be assumed true[,]" *Iqbal*, 556 U.S. at 682. Although it appears that DHS and DHCF have made some administrative mistakes, delayed certain actions, and, at times, provided confusing feedback, these actions, no matter how prevalent or frustrating, without more, do not constitute discrimination.  *See Trimble v. Dist. of Columbia*, 779 F. Supp. 2d 54, 59 (D.D.C. 2011) ("[M]erely speculating that an unidentified policy and uncorroborated practice or custom exists without providing any factual heft to support the allegation is insufficient to state a claim[.]").

Jideani has produced only one instance from which discrimination could possibly be inferred, DHCF's March 5, 2024 determination that she was not a U.S. citizen or did not have an eligible immigration status during the retroactive period of May through July 2023.   It is undisputed that Jideani has always been a United States citizen, and it does not appear that an explanation was ever provided for this finding, which could have arguably been predicated on a decisionmaker's incorrect, and potentially discriminatory assumptions, although it is unclear that the decisionmaker was ever aware of Jideani's heritage (the same notice also indicates that Jideani was denied retroactive benefits because she was not a District resident during the retroactive period).   *See* 3/5/24 DHCF Ltr.  At any rate, the Ombudsman acknowledged that this determination was made in error, and moreover, the underlying decision was not adverse,

because Jideani was admittedly not, in fact, seeking this retroactive coverage.  *See* Ombudsman Emails at 69–70.

Assuming *arguendo* that the March 5, 2024 determination was conceivably discriminatory, Jideani still fails to plausibly allege that this action was caused by the District's intentional discrimination.   The District's municipal liability can be demonstrated through (1) express municipal policy, i.e., written law; (2) an action of a final municipal policymaker; (3) widespread persistent conduct by non-policymakers (a "custom" with force of law) of which the supervising a final policymaker must know; (4) or deliberate indifference to a risk of constitutional injury.  *See Baker v. Dist. of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985).

First, Jideani does not challenge any written law, including 8 U.S.C. §§ 1611–6213, which limits the eligibility of aliens for federal public assistance benefits, and formed the basis for DHCF's March 4, 2024 determination.  Nor would she have standing to challenge that law because (1) she is an American citizen, not an alien, and (2) she did not suffer any damages because she was denied retroactive benefits that she did not request.  *See Comm. on Judiciary of U.S. House of Repr. v. McGahn*, 968 F.3d 755, 762–63 (D.C. Cir. 2020).

Second, Jideani has not challenged an action of a final municipal policymaker.  "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481–82 (1986).  Rather, "[t]he official must also be responsible for establishing *final* government policy respecting such activity before the municipality can be held liable." *Id*. at 482–83 (emphasis added).  Here, Jideani challenges determinations taken by non-final decisionmakers.  Indeed, Jideani was advised of her

right to appeal the March 5, 2024 determination, among others.  *See* 3/5/24 DHCF Ltr.; D.C.

Code § 4–210.01; *see also* 11/1/23 DHCF Ltr. (advising of right to appeal determination to

terminate medical assistance coverage) (citing D.C. Code § 4–210.09); 9/18/23 DHS Ltr.

(advising of right to appeal determination to terminate SNAP benefits).

Jideani most plausibly relies on the third theory of municipal liability—wrongdoing by

ongoing custom or practice.  *See, e.g.*, Compl. at 5–6, 11; Opp'n at 2, 4–5, 19–20.  "In the

absence of an express policy, policies and customs . . . are significantly easier to define than to

prove."  *Hunter v. Dist. of Columbia*, 824 F. Supp. 2d 125, 133 (D.D.C. 2011) (citing *Carter v.*

*Dist. of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986)).  "[T]he measure and type of proof

required is not easy to quantify[,] *id.* (quoting *Cox v. Dist. of Columbia*, 821 F. Supp. 1, 13

(D.D.C. 1993)) (internal quotation marks omitted), but a plaintiff must "present concentrated,

fully packed, precisely delineated scenarios[,]" *id.* (quoting *Parker v. Dist. of Columbia*, 850

F.2d 708, 712 (D.C. Cir. 1988)) (internal quotation marks omitted).

Rather than plead "some factual basis for the allegation of a municipal policy or custom,"

*Atchinson v. District of Columbia*, 73 F.3d 418, 422 (D.C. Cir. 1996), as noted, Jideani relies on

legal labels and phrases to suggest that the District has engaged in a discriminatory practice by

sporadically denying or unnecessarily complicating her entitlement to public assistance benefits.

But without more, these are the type of "'naked assertion[s]' devoid of 'further factual

enhancement,'" that the court need not accept as true at the motion to dismiss stage.  *See Iqbal*,

556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also Gebretsadike v. Dist. of Columbia*,

No. 23-cv-03198, 2024 WL 3291744, at *9 (D.D.C. July 3, 2024) (finding that plaintiff failed to

state a Title VI claim where he presented only broad assertions that that District's adverse

employment decisions were motivated by national origin discrimination).  Although Jideani

provides a handful of examples in which her benefits were unsettled, as discussed above, only one of those examples appeared to have anything to do with her national origin, if at all. *See Tuttle*, 471 U.S. at 824 (finding that a single incident is insufficient to establish a municipal policy). Thus, Jideani has not identified a pattern of incidents consistent with the constitutional deprivation which she claims.

Even if Jideani's examples resulted in a more demonstrable pattern, she has only provided personal illustrations of the District's alleged discrimination, and offered no allegations regarding its similar alleged discriminatory treatment of others, if any. *See Lang v. Dist. of Columbia*, No. 20-1199, 2023 WL 2708820, at *9–10 (D.D.C. Mar. 30, 2023) (finding that plaintiff failed to state a claim for municipal liability by policy or custom where she predominantly relied on her "own experience" "over the course of several years"); *see also Givens v. Bowser*, 111 F.4th 117, 122 (D.C. Cir. 2024) (holding that the plaintiff failed to state a municipal liability claim because "she never indicated the contours of any type of municipal policy" and instead made "conclusory assertions that D.C. has . . . unidentified policies, which caused it to" miscalculate the cost of her Medicaid care and delay hearings, as well as "forty [other] unnamed people."). Accordingly, Jideani's bare assertions that the District engaged in a custom, pattern, or practice to deny her benefits based on her nationality is a mere conclusory statement, insufficient to state a claim for municipal liability as a custom.

Fourth, although Jideani does not mention deliberate indifference, the court will nonetheless address it. A municipality is deliberately indifferent when the need for action "is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *see Baker*, 326 F.3d at 1306–07.

Such "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). "Although this is an objective standard, it involves more than mere negligence. It does not require the city to take reasonable care to discover and prevent constitutional violations. It simply means that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction." *Warren v. Dist. of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)).

As discussed, Jideani did not contact a final District of Columbia policymaker regarding the alleged discrimination underlying the administration of her Medicaid and IDA benefits. *See* MTD at 7 n.6 (citing https://dccouncil.gov/wpcontent/uploads/2024/08/dhcfatt.pdf) (DHCF Organizational Chart) (last visited 3/4/2025)); *see also* https://dhs.dc.gov/sites/default/files/dc/ sites/dhs/publication/attachments/DHS%20Org%20Chart_%20June%202024.pdf (DHS Organizational Chart) (last visited 3/4/2025).[3] Although Jideani contacted the Ombudsman about her Medicaid benefits, she did not communicate with a DHS or DHCF official with authority over final policy, nor did she appeal a Medicaid or IDA determination to the highest level of review or otherwise. *See id.*; *see also Carter*, 795 F.2d at 122 ("To succeed, a plaintiff must show a course deliberately pursued by the city, as opposed to an action taken unilaterally by a nonpolicymaking municipal employee.") (citation omitted); *Gebretsadike*, 2024 WL 3291744, at *8 (finding that the plaintiff failed to allege deliberate indifference when he alerted

---

[3]     The court may take judicial notice of information posted on official public websites of government agencies. *See Cannon v. Dist. of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013).

the director of the agency of alleged discrimination based on national origin, rather than a D.C.

final policymaker, and noting that although "the District of Columbia is a single legal entity . . .

the right hand may not always know the doings of the left hand.") (cleaned up).

Moreover, even if the Ombudsman was a "final policymaker," which the court does not

concede, the District was still not placed on notice of any alleged discrimination. In her emails

with the Ombudsman, Jideani alleges that DHS acted "unlawfully" and "delusively" by

terminating her Medicaid benefits, *see* Ombudsman Emails at 69, and that Ombudsman staff

were unprofessional and "compromised her identity" by reaching out to her pharmacy and

engaging in other allegedly rogue behavior, *see id.* at 50–54, 65–67, 73–75. None of these

accusations supports an allegation of discrimination based on national origin. *See id.*

Jideani did, in fact, complain to the Ombudsman about the March 5th 2024 determination

regarding her citizenship, and although she expressed her disagreement and frustration about it,

she does not allege that this determination was discriminatory or based on her national origin,

just that it was a serious error. *See id.* at 69–70, 77. The allegations of discrimination in those

emails are directed only to the staff at Georgetown University Hospital and a Safeway

pharmacist. *See id.* at 58, 73–75. Therefore, there is no indication that the District was aware of

Jideani's discrimination allegations. *See Canty*, 2022 WL 3646312, at *2–3 (finding that the

plaintiff's broad allegations that District officers subjected him to discrimination, and that the

District then acted with deliberate indifference, were insufficient to support a cognizable Title VI

or § 1983 claim of municipal liability, particularly because the plaintiff "alleged no facts

showing that the District knew or should have known of the constitutional violations he

complain[ed] of.").

Finally, even if the appropriate District policymakers were notified of DHS and DHCF's alleged discrimination, Jideani cannot state a claim of municipal liability based on deliberate indifference because, as her own submissions indicate, the District did not disregard her needs. To the contrary, the Ombudsman engaged in an ongoing dialogue with Jideani to resolve the outstanding issues surrounding her Medicaid enrollment, *see* Ombudsman Emails at 50–76, which soon thereafter was fully reinstated, *see* Opp'n at 17.  It also recognized the error regarding her citizenship, apologizing for same.  *See* Ombudsman Emails at 69–70.  Because the Ombudsman "launched an investigation" into her complaints regarding her Medicaid enrollment, their actions belies any claim of deliberate indifference.  *See Muhammad v. Dist. of Columbia*, 881 F. Supp. 2d 115, 123 (D.D.C. 2012); *Dasisa v. Dist. of Columbia Housing Auth.*, 05-1398, 2006 WL 949927, at *1–2 (D.D.C. Apr. 12, 2006) (dismissing the plaintiff's Title VI claim that the District discriminated against him in administering Section 8 benefits, where "his own evidence" belied such a claim); *Jackson v. Corrections Corp. of Amer.*, No. 06–1241, 2007 WL 1848014, at *7 (D.D.C. June 27, 2007) (dismissing municipal liability claim pursuant to Rule 12(b)(6) where the plaintiff's own submissions showed that personnel "took action on his grievances," thus undercutting his deliberate indifference claim) (citing *Brooks v. Dist. of Columbia*, No. 05–362, 2006 WL 3361521, at *9 (D.D.C. Nov. 20, 2006) (finding that the defendant was not deliberately indifferent where affirmative steps taken to remedy the plaintiff's grievance).  And although Jideani's enrollment in IDA appears to have been slightly delayed, DHS has been actively communicating with her regarding the status of her application and requesting required additional information from her.  *See* Opp'n at 18.

For all of these reasons, Jideani has not sufficiently alleged that the District intentionally discriminated against her based on her national origin under any theory of liability.   Her

personal belief that the District's actions were motivated by discrimination is conclusory and of no probative force. *See Jefferies v. Dist. of Columbia*, 917 F. Supp. 2d 10, 40–41 (D.D.C. 2013) ("Conclusory accusations of racism, indifference, selective enforcement, and underenforcement . . . cannot establish municipal policies that demonstrate a deliberate indifference[,]" and merely "[s]tating that the District has a [discriminatory] policy . . . is circular and does not constitute the well-pleaded facts necessary to state a claim.") (internal quotation marks omitted).

### ii.    <u>Other Assorted Claims</u>

#### *Common Law Claims*

In her Complaint, Jideani refers in passing to other "torts/personal injury" and "contract" claims. *See* Compl. at 7, 10–11. Insofar as she brings common law claims against the District, she has failed to assert "simple, concise, and direct" allegations in support. *See* Fed. R. Civ. P. 8(d)(1). She does not address the elements of any intended contract or tort claim; indeed, apart from negligent and intentional infliction of emotional distress, *see* Compl. at 10, and perhaps negligence, *see* Opp'n at 4, all of which she merely references without analysis, it is unclear what causes of action she is attempting to raise.

*Pro se* litigants must comply with the applicable Federal and Local Rules of Civil Procedure. *See Jarrell v. Tisch*, 656 F. Supp. 237, 239–40 (D.D.C. 1987). Relevant here, Federal Rule 8(a) requires claims to be sufficient to show that the pleader is entitled to relief, *see* Fed. R. Civ. P. 8(a); *see Iqbal*, 556 U.S. at 678–79; *Ciralsky v. CIA*, 355 F.3d 661, 668–71 (D.C. Cir. 2004), thus ensuring that defendants receive fair notice of the claims asserted so that they can prepare a responsive answer and an adequate defense, *see Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977). Jideani's prospective contract or tort claims are indiscernible, and as here, courts have "unhesitatingly dismissed" claims characterized as confusing, ambiguous, or vague.

*See id.* at 499 (citing *Wallach v. City of Pagedale, Missouri*, 359 F.2d 57, 58 (8th Cir. 1968) (per curiam)) (other citations omitted).

In any event, the court declines to exercise supplemental jurisdiction over Jideani's common law claims.  "District courts are given supplemental jurisdiction over state claims that 'form part of the same case or controversy' as federal claims over which they have original jurisdiction." *Dyson v. Dist. of Columbia*, 808 F. Supp. 2d 84, 88 (D.D.C. 2011) (quoting 28 U.S.C. § 1367(a)), *aff'd*, 710 F.3d 415 (D.C. Cir. 2013); *Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1097 (D.C. Cir. 2011) (same).  Courts consider several factors when determining whether to exercise supplemental jurisdiction, including "judicial economy, convenience, fairness, and comity." *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005), *cert. denied*, 546 U.S. 1173 (2006).  "In its discretion, the Court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction." *Dyson*, 808 F. Supp. 2d at 88 (citing 28 U.S.C. § 1367(c)(3)).

Because the court has dismissed Jideani's Title VI claim, the balance of factors weighs in favor of dismissing Jideani's contract and tort claims.  First, as noted, these claims, as pleaded, are less than cognizable, thereby militating against advancing them in this court.  *See Patterson v. Florida Dep't of Children and Families*, No. 21-1427, 2024 WL 3400123, at *3 (D.D.C. Jul. 11, 2024) (declining to exercise supplemental jurisdiction where the plaintiff's claims were pleaded deficiently); *see also Wine v. Dep't of the Interior*, 21-3349, 2022 WL 3715799, at *7 (D.D.C. Aug. 29, 2022) (declining to exercise supplemental jurisdiction where the plaintiff failed to "cite a cause of action" for his intended common law claims).

Second, as far as these common law claims are understood, they involve purely state law issues, and "federal judges should refrain from deciding cases founded solely on local law when

the requirements for diversity jurisdiction are not present." *Lowe v. Dist. of Columbia*, 669 F.

Supp. 2d 18, 31–31 (D.D.C. 2009) (quoting *Mitchell v. Yates*, 402 F.Supp.2d 222, 235 (D.D.C.

2005)); *see United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of

state law should be avoided both as a matter of comity and to promote justice between the

parties, by procuring for them a surer-footed reading of applicable law.  Certainly, if the federal

claims are dismissed before trial, . . . the state claims should be dismissed as well."); *Edmondson*

*& Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1266 (D.C. Cir. 1995) (noting that

judicial economy and convenience at the motion to dismiss stage do not favor the federal court

exercising supplemental jurisdiction over remaining state law claims following dismissal of the

federal claims); *see also Trimble*, 779 F. Supp. 2d at 60 (declining to exercise supplemental

jurisdiction over D.C. statutory and common law claims after dismissal of civil rights claim).

Third, "using the judicial resources of the Federal Courts to try local claims is not in the

interest of judicial economy." *Meed v. Lindlaw*, 839 F. Supp. 2d 66, 75 (D.D.C. 2012).  Fourth,

this declination does not cause inconvenience, as all parties are located in the District, and this

case has not proceeded beyond its early stages.  *See id*. at 74.  Fifth, Jideani suffers no prejudice

since the statute of limitations has been tolled while this case is pending, and will remain tolled

for 30 days after its dismissal.  *See id*. (citing 28 U.S.C. § 1367(d)); *Shekoyan*, 409 F.3d at 419

(same).

<u>Review of Local D.C. Benefits Determinations</u>

Finally, to the extent that Jideani seeks to directly challenge a Medicaid or IDA coverage

determination and demands injunctive relief arising therefrom, or seeks reimbursement for costs

incurred during any lapses in coverage, she must exhaust her local administrative remedies.  *See*

MTD at 11 n.10.  If an individual is dissatisfied with a local public assistance benefit

determination, the District maintains its own comprehensive remedial scheme to such a challenge, which starts with an administrative appeal. *See Mykonos v. United States*, 59 F. Supp. 3d 100, 102 (D.D.C. 2014) (citing D.C. Code § 4–210.01). "A request for an administrative appeal prompts a two-phase review process, consisting of an informal review by the [D.C.] Department of Human Services followed by a formal review by the D.C. Office of Administrative Hearings . . . [and] [a]t either stage of this review process, an applicant may be reclassified as eligible for Medicaid and be reimbursed for medical expenses incurred during the period they were not covered." *See id.* at 102–03 (citing 42 C.F.R. § 435.915(a)(1)); *see also* 20 C.F.R. § 416.1920 (state review of IDA determinations).

Because the District maintains a "comprehensive remedial scheme to address such claims[,]" Jideani is prohibited from "immediate resort to federal district court," *Burns v. Zeilinger*, No. 22-3694, 2023 WL 183659, at *1 (D.D.C. Jan. 10, 2023) (dismissing complaint challenging the District's SNAP benefits determination) (quoting *Patten v. Dist. of Columbia*, 9 F.4th 921, 927 (D.C. Cir. 2021); citing *Brooks v. Dist. of Columbia*, 375 F. Supp. 3d 41, 49 (D.D.C. 2019) (noting that D.C. Code § 2–1831.03 "enumerates the types of cases over which the OAH has jurisdiction, including cases arising under the jurisdiction of the Department of Human Services"); D.C. Code § 2–1831.02 (establishing OAH "for the administrative adjudication of [applicable] cases); *id.* §§ 2–1831.16(c), 16(e) (authorizing "any person suffering a legal wrong or adversely affected or aggrieved by any order of the Office in any adjudicated case" to then "obtain judicial review of that order" in the D.C. Court of Appeals)).

In sum, Jideani cannot raise a direct challenge to any Medicaid or IDA determination in this court because she has not exhausted the avenues of administrative and local judicial review available to her. *See Mykonos*, 59 F. Supp. 3d at 106 (dismissing the plaintiff's challenge to his

Medicaid determination pursuant to Federal Rule 12(b)(6) for failure to exhaust); *see also* D.C. Code § 2–510.

### IV.    <u>CONCLUSION</u>

For the reasons stated above, the court finds that Jideani has not sufficiently pleaded a Title VI claim for discrimination based on her national origin. Nor has she stated a common law claim, over which the court also declines to exercise supplemental jurisdiction.  The court also finds that Jideani has failed to exhaust any direct challenges to her Medicaid or IDA benefits determinations.  The court thus grants the District's Motion to Dismiss pursuant to Rule 12(b)(6). A separate Order is contemporaneously issued and accompanies this Memorandum Opinion.

Date:   May 20, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge